Robert F. McCauley (SBN 162056)
robert.mccauley@finnegan.com
Erik R. Puknys (SBN 190926)
erik.puknys@finnegan.com
Jeffrey D. Smyth (SBN 280665)
jeffrey.smyth@finnegan.com
Christopher B. McKinley (SBN 306087)
christopher.mckinley@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
3300 Hillview Avenue
Palo Alto, California  94304
Telephone:     (650) 849-6600
Facsimile:      (650) 849-6666

Attorneys for Plaintiff
FOX FACTORY, INC.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| FOX FACTORY, INC., <br><br> Plaintiff, <br><br> v. <br><br> SRAM, LLC, <br><br> Defendant. | Case No. 3:16-cv-03716-WHO <br><br> **PLAINTIFF FOX FACTORY, INC.'S OPENING CLAIM CONSTRUCTION BRIEF REGARDING U.S. PATENT NOS. 8,226,172 AND 8,974,009** <br><br> Tutorial Date: September 22, 2017 <br> Hearing Date: September 29, 2017 <br> Time:         9:00 a.m. <br> Courtroom:   2, 17th Floor <br> Judge:        Hon. William H. Orrick |

1

## **<u>TABLE OF CONTENTS</u>**

2

I.      INTRODUCTION ........................................................................................................ 1

II.     STATEMENT OF RELEVANT FACTS ................................................................... 1

        A.     Background........................................................................................................ 1

        B.     Prior Art and FOX's Claimed Invention .............................................. 3

III.    CLAIM CONSTRUCTION PRINCIPLES................................................................. 8

IV.     ARGUMENT .............................................................................................................10

        A.     "axle".............................................................................................................10

        B.     "first end" ....................................................................................................12

        C.     "second end" ...............................................................................................14

        D.     "cam assembly"...........................................................................................15

        E.     "operatively connected" ..........................................................................18

        F.     "substantial portion of said lever"....................................................20

        G.     "substantially unimpeded by an adjacent part of said vehicle" (the '172 patent)..22

        H.     "does not substantially interfere with said adjacent vehicle component when said axle is rotated" (the '009 patent).................................................................24

V.      CONCLUSION ...........................................................................................................25

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Black & Decker, Inc. v. Robert Bosch Tool Corp.*,
  260 F. App'x 284 (Fed. Cir. 2008) ................................................................. 16

*Deering Precision Instruments, L.L.C. v. Vector Distribution Sys., Inc.*,
  347 F.3d 1314 (Fed. Cir. 2003) ........................................................ 21, 22, 24

*In re Glaug*,
  283 F.3d 1335 (Fed. Cir. 2002) ......................................................... *passim*

*Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*,
  790 F.3d 1298 (Fed. Cir. 2015) ......................................................... *passim*

*Kumar v. Ovonic Battery Co.*,
  351 F.3d 1364 (Fed. Cir. 2003) ................................................................. 10

*Lexion Med., LLC v. Northgate Techs., Inc.*,
  641 F.3d 1352 (Fed. Cir. 2011) ................................................................... 9

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005) ........................................................ 12, 17, 19

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) ............................................................ *passim*

*Microsoft Corp. v. Int'l Trade Comm'n*,
  731 F.3d 1354 (Fed. Cir. 2013) ................................................................. 15

*Nystrom v. TREX Co.*,
  424 F.3d 1136 (Fed. Cir. 2005) ................................................................... 9

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008) ........................................................ 8, 12, 14

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ......................................................... *passim*

*Playtex Products, Inc. v. Proctor & Gamble Co.*,
  400 F.3d 901 (Fed. Cir. 2005) ................................................................. 20

*ResQNet.com, Inc. v. Lansa, Inc.*,
  346 F.3d 1374 (Fed. Cir. 2003) ........................................................ 12, 17, 19

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ............................................................. 9, 16

## I.   INTRODUCTION

This case involves two FOX patents related to quick release axles for bicycles—U.S. Patent Nos. 8,226,172 ("the '172 patent") and 8,974,009 ("the '009 patent"). The parties ask the Court to construe eight terms and phrases related to aspects of the claimed axles. Most of the disputed claim terms appear in both patents and the parties agree the terms should have the same meaning in each. FOX's proposed constructions are well grounded in the intrinsic evidence of the patents-in-suit and conform to the canons of claim construction. SRAM's proposed constructions are generally unsupported by the intrinsic evidence and do not comport with the context provided by the written description of the patents. Accordingly, FOX respectfully asks the Court to adopt its proposed constructions for each of the disputed terms.

## II.   STATEMENT OF RELEVANT FACTS

### A.   Background

The technology in this case relates to wheel axles commonly used in mountain bike suspension forks. Examples of some of FOX's suspension fork and axle products are depicted below:

   

Fork →
Axle →

Back in the 1930s, Campagnolo marketed and popularized a "quick release" skewer device for quickly removing and remounting a bicycle wheel without tools, and that fundamental design is

still in use in some products today. *See* Ex. F [www.sheldonbrown.com/skewers.html].[1] An example of such a hub skewer quick release design is shown in the photo below:



*Id.* The skewer rod shown in the photo is pushed through a hollow wheel hub axle (*see id.*) which is then fitted and secured into "dropout" U-shaped open slots at the base of a fork. These quick release hub skewer devices facilitate quick and simple tire changes, without the need for any tools. For further background on bicycle wheel quick release mechanisms, see Exhibit F (www.sheldonbrown.com/skewers.html).

More recently, bicycle designs have trended towards increased specialization in high-end bicycle markets. For example, road bicycles designed specifically for road-racing have a relatively small number of streamlined and light-weight parts, and often use Campagnolo-style hub skewer quick releases. In contrast, downhill bicycles are designed specifically for off-road downhill racing, which involves racing down the side of a mountain, navigating drops and jumps, and bouncing over rocks and other obstacles at high speeds. As explained in the specification of the patents-in-suit, "mountain bikes designed for downhill events have evolved with much stronger, but heavier components." Ex. A at 1:43-44.[2] "Due to the severe operating stresses, the downhill bike axle is very similar to a motorcycle axle, being comparatively large in diameter (e.g., 20 mm or 30 mm) and heavy in construction to provide strength and rigidity, and is usually rigidly fixed to the mountain

[1] Citations to "Ex. __" refer to exhibits to the Declaration of Jeffrey D. Smyth in Support of FOX Factory's Inc.'s Opening Claim Construction Brief Regarding U.S. Patent Nos. 8,226,172 and 8,974,009.

[2] The '172 and '009 patents share the same specification. For simplicity, cites to the specification are to the '172 specification; the '172 patent is Exhibit A to the Smyth Declaration. For patent cites in the form of "Ex. __ at xx:yy," "xx" refers to the column and "yy" refers to the line.

bike [fork] by bolts that require tools for removal." *Id.* at 1:51-56. Each downhill race lasts only a matter of minutes (*id.* at 2:18) and there is no need to quickly replace a wheel because if a rider gets a flat tire, that rider's race is over.

Cross-country bicycles, on the other hand, are designed for long endurance races that require rapid uphill climbs as well as descents over hilly and varied off-road terrain. "In contrast [to downhill mountain bikes], cross-country mountain bikes have evolved with much lighter components. . . . Many cross country components have been adapted or borrowed from road bikes, where the requirement for lightness is paramount." *Id.* at 1:57-61. Because cross-country races are often several hours long (*id.* at 2:18-19), cross-country racers also have time to change out a wheel with a flat tire and continue racing. For that reason, "the ability to remove and replace a wheel as quickly and as easily as possible is of utmost importance in cross-country mountain biking" (*id.* 2:20-23). For that reason, the hub skewer quick releases used on road bikes have also been  used "almost 'as-is' on mountain bikes, despite the fact that an off-road surface typically subjects a mountain bike to much higher stresses than are typically encountered in road biking." *Id.* at 1:61-2: 3. But because of their thinness, these hub skewer quick releases also tend to flex and handle less precisely than thicker downhill axles in difficult terrain. *Id.* at 2:4-9.

**B.    Prior Art and FOX's Claimed Invention**

At the time of the invention leading to the '172 and '009 patents, there were two standards for bicycle axles: hub skewer quick releases inserted into 9 mm hub axles and secured to forks via open dropouts (often used in cross-country bicycles), and 20 and 30 mm "thru-axles" that were run through hoops at the base of each fork leg and bolted into place with tools (often used in downhill bicycles). Ex. A at 1:51-54, 2:4-7; Ex. D [Galasso] at 25:20-25; 59:22-60:12. FOX set out to establish a new axle standard or product category that would particularly benefit cross-country bicycles—"an improved quick release which combine[d] the stiffness and durability properties of downhill-type axles with the fast release properties of cross-country quick releases." Ex. A at 2:59-62; Ex. D [Galasso] at 24:3-16, 58:24-60:12; Ex. E [Laird] at 152:17-153:3. FOX achieved these goals with its patented design, a thru-axle that is sturdier than quick release hub skewers and that can

also be quickly installed and removed with one hand (to facilitate rapid wheel changes during a race), as explained in more detail below.

FOX's new design addressed several known problems with existing axles. For example, a SRAM design that was based on the Campagnolo 1930s skewer design is disclosed in U.S. Patent No. 7,090,308 to Rose (Ex. C [Rose]). As shown in Figure 1 below, the Rose design continued the prior art use of a "rod or skewer" (26) inserted into a "tubular body" (12) (the axle shaft) that ran through two loops at the base of the fork. *Id.* at 3:14-17, Fig. 1.



FIG. 1

The Rose axle shaft (12) had slots (25) at each end of the shaft that allowed the ends of the shaft to expand and contract. The ends of the shaft expanded when the skewer was rotated into a closed position by the lever, which forced/squeezed wedges (called an expansion washers 42, 48) into the slotted ends of the axle shaft. *Id.* at 3:8-33, 3:46-62, 4:17-47. This radially expanded the slotted ends of the axle shaft and thus secured them into fork dropouts (18, 20). *Id.* at 3:48-62, Fig. 2 (below).



FIG. 2

*Id.* at Fig. 2.

In their patent specification, the FOX inventors specifically discussed several disadvantages of the Rose and other skewer designs and how FOX's design resolved and improved upon them.[3] For example, one problem with skewer designs is elastic stretch of the long, thin skewer, which in turn leads to loosening of the axle assembly. Ex. A at 10:43-50. FOX eliminated the skewer and created a new design shown in Figure 3B below:



FOX's design includes, among other things, a cylindrical axle shaft having a "first end" that screws into one fork leg (at the left of Fig. 3B), a cam assembly (4), and short cam follower shaft (15) rigidly affixed to the "second end" of the axle shaft. As explained in the specification:

> It is to be noted that the cam follower shaft 15 does not extend the full length of the shaft 13. This is in contrast to existing quick release skewers which span at least the distance between dropouts. A shorter cam follower shaft 15 reduces the amount of elastic stretch of the cam follower shaft when the axle assembly 2 is in use, which in turn reduces any propensity for elastic vibration loosening of the quick release lever.

Ex. A at 10:43-50.

Another problem with the Rose skewer design is its mechanism for securing the axle shaft in place. As described above, the Rose axle shaft is secured in place by forcing an expansion washer into each end of the axle shaft, causing the slotted ends of the axle shaft to expand. The FOX patent specification explains that repeated expansion and contraction of the axle shaft can eventually cause

---

[3] The specification of the '172 patent interchangeably refers to the pre-grant publication of Rose (U.S. PG-Pub No. 2005/0110335) as the '355 application, and to U.S. Patent No. 7,090,308 to Rose. Here, for clarity, both the publication and the patent are referenced as Rose.

1    the axle shaft to crack, requiring the axle to be replaced.[4] The specification also explains that Rose's

2    expansion washers have a tendency to get stuck within the ends of the axle shaft even when the lever

3    is opened, which "subverts any quick release benefit that may have otherwise been realized." *Id.* at

4    2:53-58.

5        FOX solved these and other problems by securing its inventive axle to the fork in a different

6    way. FOX eschewed Rose's radial expansion design (using wedges to expand the ends of the axle

7    shaft to fit into the fork dropouts), and instead designed an axial tightening/compression system

8    (squeezing and clamping the legs of the fork closer together) to secure the axle to the fork and add

9    rigidity/stability to the system. In FOX's design the "first end" of the axle shaft has threads that

10   screw into corresponding threads in one fork leg, and a cam assembly affixed to the "second end" of

11   the axle shaft. After rotating the lever to screw the first end into the fork leg, moving the lever into a

12   closed or "locked' position (Position 1 in Fig. 3A below) causes the cam (inside cam housing 4) to

13   move toward the adjacent fork leg and second end of the axle shaft, squeeze the legs of the fork

14   together, and secure the axle assembly to the fork. Ex. A at 4:16-48, Fig. 3A.



FIG. 3A

21   Because there are no slots or wedges that cause the axle shaft to expand and contract in FOX's

22   design, the axle shaft does not crack with repeated use, and there are no wedges to get stuck.

---

[4] The FOX specification notes that Rose's slotted axle design "subvert[s] the rigidity of the axle[,] and may ultimately lead to early fatigue failure due to differential flexure . . . of the axle material adjacent opposing sides of the slots (e.g., causing crack propagation from the apex of the slot)." Ex. A at 2:24-45. Further, the differential flexure "may be further exacerbated by the repeated radial expansion and relaxation, during installation and removal, of the axle 'tabs' creates by the slots." *Id.* at 2:44-52.

FOX FACTORY'S OPENING CLAIM CONSTRUCTION BRIEF
CASE NO. 3:16-CV-03716-WHO

The FOX invention also included a lever stop that limits the lever's maximum angle of rotation between the open position (Position 2 in Fig. 3B below) and the "locked" or closed position (Fig. 3A *supra*), so that when the lever and cam are then rotated to either tighten or loosen the axle in the fork, the lever is "substantially unimpeded" by an adjacent fork leg or other component during that rotation. Ex. A at 4:30-48, 5:3-9.



**FIG. 3B**

POSITION 2

The lever stop and limited angle of lever rotation (between the open and closed positions) enables a rider to quickly and easily engage/tighten or remove the axle with a single hand and without interference from the adjacent fork leg or other component. As explained in FOX's specification:

> We have identified a further problem arising in certain situations. When using one hand to rotate the axle using the quick release lever, the rotation of the lever can be blocked by another part of the bicycle such as the cylinder of a suspension fork. We have overcome this problem by limiting the range of motion of the lever between open and closed positions (i.e. locked and released), so that the lever can be rotated to thread the opposite end of the axle into the axle nut without interfering with a component of the bicycle. During rotation the user does not have to manipulate the lever so as to avoid an adjacent bicycle component.

Ex. A at 4:5-15; *see also id.* at 11:32-36.

The claims of the '172 and '009 patents reflect the benefits of FOX's design described above. Claims 1 and 2 of the '172 patent are representative of the claims of that patent asserted in this case, and state (with disputed claim terms emboldened and underlined):

> 1. An **axle** for removably retaining a wheel on a vehicle, said axle comprising:
> a **first end**;
> a **second end**;
> a rotary-type connector at said first end;
> a **cam assembly operatively connected to said second end**, said cam assembly including a cam having an axis of rotation;
> a lever **operatively connected to said second end of said axle**, said lever being rotatable about an axis substantially parallel said axis of rotation

of said cam, between an open position in which said axle is removable from and mountable on said vehicle and a closed position in which said axle is retained on said vehicle, wherein said lever is configured such that when said lever is in said closed position a **substantial portion of said lever** occupies a position within a recess of an adjacent vehicle component such that a portion less than a whole of said lever protrudes laterally from said vehicle; and

a lever stop ensuring that an angle of maximum rotation for said lever from said closed position is less than 180 degrees.

2. The axle of claim 1, wherein said lever is configured such that a rotation of said lever about a longitudinal axis of said axle causes engagement or disengagement of said rotary-type connector with a component part of said vehicle, and wherein said angle of maximum rotation is such that said lever is rotatable about said longitudinal axis **substantially unimpeded by an adjacent part of said vehicle**.

Ex. A at 16:25-54 (emphases added on the disputed claim terms).

Similarly, claim 1 of the '009 patent is representative of the claims from that patent asserted in this case, and states:

1. An **axle** for removably retaining a wheel on a vehicle, said axle comprising:

a rotary-type connector at a **first end** thereof;

a **cam assembly operatively connected to the second end**, said cam assembly including a cam having an axis of rotation;

a lever **operatively connected to a second end of said axle**, said lever being rotatable about an axis substantially parallel said axis of rotation of said cam, between an open position in which said axle is removable and mountable on said vehicle and a closed position in which said axle is retained on said vehicle, wherein said lever has a closed position in which a **substantial portion of said lever** occupies a position relative to an adjacent vehicle component such that a portion less than a whole of said lever protrudes laterally from said vehicle; and

a lever stop ensuring that an angle of maximum rotation for said lever is sufficiently limited to ensure that said lever, in said open position, **does not substantially interfere with said adjacent vehicle component when said axle is rotated**.

Ex. B at 16:36-55 (emphases added on the disputed claim terms).

## III.  CLAIM CONSTRUCTION PRINCIPLES

"The purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed.'" *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (citation omitted). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citation omitted). "[T]he words of a

claim 'are generally given their ordinary and customary meaning'. . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (citation omitted). "The customary meaning of a claim term is not determined in a vacuum and should be harmonized, to the extent possible, with the intrinsic record, as understood within the technological field of the invention." *Lexion Med., LLC v. Northgate Techs., Inc.*, 641 F.3d 1352, 1356 (Fed. Cir. 2011).

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. The "[c]laims must be read in view of the specification, of which they are a part." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). The specification acts as a dictionary for claim construction when it expressly defines terms used in the claims or when it defines them by implication. *See Phillips*, 415 F.3d at 1315 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). A court must, nevertheless, "avoid the danger of reading limitations from the specification into the claim." *Id.* at 1323. Upon gleaning context from the specification, "it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive." *Id.*

The prosecution history is akin to the specification in that it "provides evidence of how the PTO and the inventor understood the patent," and "was created by the patentee in attempting to explain and obtain the patent." *Id.* at 1317. The Federal Circuit often deems the prosecution history to be of "critical significance" to ascertaining "the meaning of the claims." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Extrinsic evidence consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. "Extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319; *see also Nystrom v. TREX Co.*, 424 F.3d 1136, 1143 (Fed. Cir. 2005) ("[U]ndue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the [intrinsic record].").

## IV.   ARGUMENT

### A.   "axle"

| Claim Term | FOX | SRAM |
|---|---|---|
| "axle" | "a cylinder upon which a wheel hub rotates" | "cylindrical component around which a wheel rotates" |

The parties disagree regarding the meaning of "axle," a term that appears in the preamble of the asserted claims. The parties' dispute may appear on its face to be minor—essentially differing as to whether the axle is a component *upon* which a wheel hub rotates or *around* which a wheel rotates—but this slight difference has an important practical impact on the scope of the claims:  is the axle a shaft that supports a wheel hub, or can it merely be any cylinder that the wheel rotates around (such as the Rose skewer, a rod that extends through a tubular axle shaft but does not support the wheel hub)? FOX's proposed construction—a cylinder *upon* which a wheel hub rotates— recognizes that the axle supports a wheel hub, which is not only consistent the patents-in-suit, but also with how the word axle has traditionally been used in the field, as SRAM's own dictionaries show. Thus, only FOX's construction is consistent with both the intrinsic and extrinsic evidence.

Most importantly, the '172 and '009 patents describe and claim an axle that supports a wheel hub. Indeed, the very title of the patents, "Methods and Apparatus for Releasably *Supporting* a Vehicle Wheel Assembly," expressly references the support function that the axle must play. Similarly, consistent with the title of the patents, the specification contemplates that the axle shaft supports the wheel hub. For example, the specification states: "The user then threads the axle shaft 13 through the lever bracket 6, through a hub of a wheel . . . ." Ex. A at 13:41-43. The patents-in-suit also expressly incorporate by reference the Rose patent discussed above (Ex. A at 9:43-45), so that Rose is part of the intrinsic record of the patents-in-suit. *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003) ("prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence"). The Rose patent also describes an axle shaft, calling it "tubular body 12." *See, e.g.,* Ex. C at Fig. 1, 2:63-65. And the Rose patent, like the patents-in-suit, also indicates that the tubular body/axle shaft supports a wheel. *See, e.g., id.* at 2:65-67 ("The wheel hub 14 mounts rotatably on the tubular body 12 . . . .").

In addition to this intrinsic evidence, the extrinsic evidence also supports FOX's proposed claim construction. Indeed all of SRAM's own dictionary definitions emphasize that an axle shaft supports the wheel: "[a] cross-shaft which *carries* the driving or freely-mounted wheels of any vehicle;" "[a] supporting shaft or member *upon* which a wheel or wheels revolve;" or "[a] supporting member that *carries* a wheel and . . . allows the wheel to rotate freely *on it*." Dkt. 37 at Ex. A, p. 2 (emphases added). Each of these definitions indicates that the wheel rests upon or is carried by the axle, and that an axle is not merely any component around which a wheel rotates.

SRAM's proposed construction, in contrast, must be rejected as inconsistent with the intrinsic evidence. Specifically, SRAM's construction is incorrect because it encompasses not only the axle shaft, but also the Rose skewer (which is something "around" which a wheel rotates, but does not support the wheel hub). The specification of the patents-in-suit makes it clear that the recited axle is nothing like the Rose skewer.

To explain, the '172 and '009 patents discuss several axle designs, but pay especially close attention to the Rose skewer design in which a full-length skewer (marked 26, below) is inserted through the tubular body/axle shaft (marked 12, below). *See* Section II.B.



FIG. 1

The patents-in-suit specifically—and repeatedly—criticize Rose's skewer and washer design. *See, e.g.*, Ex. A at 10:43-50 (noting that FOX's use of a short cam follower shaft rather than "existing quick release skewers" "reduces the amount of elastic stretch of the cam follower shaft when the axle assembly 2 is in use, which in turn reduces any propensity for elastic vibration loosening of the quick release lever."); 2:37-40 ("slots in the [Rose] axle body . . . subvert the rigidity of the axle and may ultimately lead to early fatigue failure"); 2:50-52 ("built in stress risers such as those included in [Rose] are not desirable"); 2:53-58 (noting that [Rose] expansion washers can become stuck in

axle ends and "subvert[] any quick release benefit"). Thus, the '172 and '009 patents expressly define their invention "in contrast to the existing quick release skewers" such as those described in Rose. Ex. A at 10:44-46. Accordingly, the specification of the patents-in-suit indicates that the recited axle is not a skewer like that described in Rose.

Because the '172 and '009 patents draw a clear distinction between their inventive axle and the hub skewer design in Rose, the term "axle" should not be construed in a way that would capture the Rose skewer. *See LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1343–44 (Fed. Cir. 2005) ("While it is true that not every advantage of the invention must appear in every claim, it would be peculiar for the claims to cover prior art that suffers from precisely the same problems that the specification focuses on solving."); *see also ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1380 (Fed. Cir. 2003) ("[T]he specification, including those portions relating to extant problems in prior art, properly confirms the meaning of claim language."). Because SRAM's construction would encompass the very Rose design the FOX inventors distinguished and criticized, that construction should be rejected.

### B.    "first end"

| Claim Term | FOX | SRAM |
|---|---|---|
| "first end" | first end of the axle | No claim construction necessary; phrase should be given its plain and ordinary meaning |

FOX proposes that "first end" means "first end of the axle." SRAM does not agree with FOX's construction, but has not proposed a competing construction. When the parties dispute the meaning of a claim term the Court should resolve it. *O2 Micro*, 521 F.3d at 1360. Moreover, SRAM has contended that "first end" is indefinite in its invalidity contentions, so that it's "plain and ordinary meaning" position is likely a tactic meant to preserve an argument that the term is indefinite when it is certainly not when read in the context of the entire claim (and should be construed for that reason).

Reading the preambles and the claims in their entireties, "first end" clearly means first end of the axle. Claim 1 of the '172 patent recites "said axle comprising: a first end . . . [and] a rotary-type connector at said first end . . . ." Ex. A at 16:28-30. Similarly, claim 1 of the '009 patent recites "said

axle comprising: a rotary-type connector at a first end . . . ." Ex. B at 16:36-37. In both patents, "first end" derives antecedent basis from the recitation of "axle" in the preamble. Ex. A at 16:26-30; Ex. B at 16:37-38. Thus, "first end" refers to the first end of the axle in both patents.

The specification also supports this construction. For example, the specification repeatedly describes the axle as having a rotary type connector at a first end thereof. Ex. A at 4:20-21 ("The axle comprises a rotary-type connector at a first end thereof."), 7:10-14 ("In one embodiment, a method of fabricating an axle fork assembly comprises mounting a rotary-type connector at a first end of an axle . . . ."). The figures also show that it is the first end of the axle—and only the first end of the axle—has a rotary-type connector (i.e., a thread), thereby confirming that "first end" means first end of the axle. Ex. A at Figs. 1A-3D, 4A-4D, 10-11B.

Moreover, during prosecution of the '172 patent, FOX explained to the PTO that that Figs. 3A and 3B depicted the first and second ends of the axle so as to provide clarity to what is meant by the "first end." Ex. G ['172 File History] at FOXII0000148 ("Applicants respectfully submit that the claim amendments, specifically calling out a first end and a second end, as well as Figures 3A and 3B . . . provides clarity as to what element includes the second end.").

SRAM has not proposed a construction for this term or described what it alleges is the plain meaning. In SRAM's invalidity contentions, when mapping the claim language to the prior art, SRAM refers to the "first end" as a first end of the axle, which is consistent with FOX's proposed construction. Ex. H [SRAM Initial Invalidity Contentions, Appx. A] at 2 (reproduced below).



| | Claim 1 of the '172 patent | SRAM's Maxle 360 / Rear Maxle |
|---|---|---|
| 1.1 | a first end; a second end; | The Maxle has a first end and a second end. |

Accordingly, FOX's proposed construction of "first end" should be adopted.

C.      "second end"

| Claim Term | FOX | SRAM |
|------------|-----|------|
| "second end" | second end of the axle | No claim construction necessary; phrase should be given its plain and ordinary meaning |

FOX proposes that "second end" means "second end of the axle." The analysis for this term is very similar to "first end." As with "first end," SRAM does not agree with FOX's construction, but has not proposed a competing construction and the Court should resolve the dispute. *O2 Micro*, 521 F.3d at 1360. SRAM has similarly asserted that this term is indefinite, when it is not when read in the context of the claim (and should be construed for that reason).

Reading the claims in their entirety, it is clear that "second end" means second end of the axle. Claim 1 of the '172 patent recites "said axle comprising . . . a second end . . . [and] a cam assembly operatively connected to said second end . . . ." Ex. A at 16:26-31. Similarly, claim 1 of the '009 patent recites "said axle comprising . . . a cam assembly operatively connected to the second end . . . ." Ex. B at 16:36-39. In both patents, "second end" derives antecedent basis from the recitation of "axle" in the preamble. Ex. A at 16:26-31; Ex. B at 16:36-39. Thus, "second end" refers to the second end of the axle.

The specification also supports this construction, repeatedly describing the axle as having a cam assembly operatively connected to a second end thereof. Ex. A at 4:22-23 ("The axle comprises a cam assembly operatively connected to the second end . . . ."), 7:27-29 ("The method of fabricating axle nut fork assembly further comprises mounting on a second end of the axle a lever-operated cam assembly . . . ."). And the figures depict the second end of the axle having a cam assembly operatively connected thereto, thereby indicating "second end" means second end of the axle. Ex. A at Figs. 1A-3D, 4A-4D, 10-11B.

Moreover, during prosecution of the '172 patent, FOX explained to the PTO that that Figs. 3A and 3B depicted the first and second ends of the axle so as to provide clarity to what is meant by the "second end." Ex. G ("Applicants respectfully submit that the claim amendments, specifically calling out a first end and a second end, as well as Figures 3A and 3B . . . provides clarity as to what element includes the second end.").

SRAM has not proposed a construction for this term or described what it alleges is the plain meaning. SRAM's invalidity contentions contend that "it is unclear what element of the invention includes 'the second end'" implicitly acknowledging that this term may require construction. Ex. I at 15. In other portions of its contentions SRAM refers to the "second end" as a second end of the axle (consistent with FOX's proposed construction). Ex. H at 2 (reproduced above). For all of the above reasons, FOX's proposed construction of "second end" should be adopted."

**D.      "cam assembly"**

| Claim Term | FOX | SRAM |
|---|---|---|
| "cam assembly" | cam assembly (including a cam and a cam follower shaft not extending the full length of the axle) | a collection of parts fitted or cooperating together to form a camming structure |

The parties disagree regarding the meaning of "cam assembly" and particularly whether the construction of the term should expressly describe components of the claimed assembly. FOX submits that because "cam assembly" is not a term with a generally agreed upon meaning, identification of the parts included in the claimed cam assembly follows the principles of claim construction would be helpful for the jury. SRAM's construction would leave the term ambiguous and be unhelpful to the jury.

Here, the construction of "cam assembly" should match the explanation provided by the inventors in the claims and specification. *See Kaneka Corp. v. Xiamen Kingdomway Grp. Co.*, 790 F.3d 1298, 1305 (Fed. Cir. 2015) (finding that because the term "sealed" may have more than one plain and ordinary meaning, the appropriate definition needed to be ascertained from the intrinsic evidence); *Microsoft Corp. v. Int'l Trade Comm'n*, 731 F.3d 1354, 1360 (Fed. Cir. 2013) (finding the term "state" was "so general on its face that it begs for clarification from the specification"); *In re Glaug*, 283 F.3d 1335, 1340 (Fed. Cir. 2002) (finding the word "intermittently" was susceptible to various meanings and would be limited by the inventor's lexicography).

The language of the claims supports FOX's proposed construction. The claims of both patents recite "a cam assembly operatively connected to said second end, said cam assembly including a cam having an axis of rotation . . . ." Ex. A at 16:31-33. Accordingly, the claim language

1  requires the cam assembly to include a cam, which matches FOX's proposed construction. *Id.* at

2  16:31-33. The claims of both patents also require that the cam assembly be operatively connected to

3  the second end of the axle, i.e., the cylinder upon which a wheel hub rotates. Ex. A at 16:31-33;

4  Ex. B at 16:39-41. Because the claims require the cam assembly to be connected to the axle, the

5  portion of the assembly connecting the cam to the axle shaft (i.e., the cam follower shaft) is also

6  necessarily part of the cam assembly. *See Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 260 F.

7  App'x 284, 288-89 (Fed. Cir. 2008) (construing "power conversion circuit" to include a non-claimed

8  DC/DC converter when the specification explained that the DC/DC converter was required for the

9  "power conversion circuit" to adjust voltage in the claimed manner).

10  The specification also supports FOX's proposed construction. As noted above, the

11  specification states and shows that the connection between the second end of the axle and the cam

12  assembly is accomplished by the cam follower shaft. Ex. A at 10:33-41, Fig. 3B (annotated below).



13  FIG. 3B

20  The specification states that the cam follower shaft 15 is "located in the shaft 13," "attached

21  proximate its innermost end to the shaft 13," and "held in rotational position by a pin 14 which

22  penetrates the wall of the shaft 13 . . . ." Ex. A at 10:33-41, Fig. 3B (above). The specification

23  further explains that the cam assembly includes a cam housing and a cam, and that both are "retained

24  on the opposite end of the cam follower shaft 15." Ex. A at 4:23, 63-65, 10:52, Fig. 3A. If the cam

25  follower shaft were not included as part of the assembly then *none* of the disclosed embodiments

26  would practice the invention. A construction that excludes preferred embodiments is "rarely, if ever,

27  correct." *See Vitronics*, 90 F.3d at 1583; *Kaneka*, 790 F.3d at 1304. Thus, here the cam follower

28

1  shaft should be included as part of the "cam assembly" and the construction of this term should

2  reflect that.

3       The specification further states that the cam follower shaft does not extend the entire length

4  of the axle. The patentee specifically described this design and relied on it in distinguishing the

5  existing quick release skewers, such as those described in Rose:

6      It is to be noted that the cam follower shaft 15 does not extend the
    full length of the shaft 13.  This is in contrast to existing quick

7      release skewers which span at least the distance between dropouts.
    A shorter cam follower shaft 15 reduces the amount of elastic

8      stretch of the cam follower shaft when the axle assembly 2 is in
    use, which in turn reduces any propensity for elastic vibration

9      loosening of the quick release lever.

10

11  Ex. A at 10:43-50. The term "cam assembly" should not be construed in a way that would

12  encompass the very design the FOX inventors distinguished. *LizardTech*, 424 F.3d at 1343-44.

13  Elastic stretch and unintentional loosening of the lever are noted problems with the prior art hub

14  skewer quick release design, and the FOX inventors distinguished their claimed invention from those

15  hub skewer designs by noting that their shortened cam follower shaft eliminated these problems.

16  Ex. A at 10:43-50. Accordingly, providing a cam assembly that includes a cam follower shaft that

17  does not extend the entire length of the axle was an intentional limitation of claim scope that should

18  be reflected in the patent claims. *LizardTech*, 424 F.3d at 1343-44; *see also ResQNet.com*, 346 F.3d

19  at 1380.

20       In contrast, SRAM's construction—"a collection of parts fitted or cooperating together to

21  form a camming structure"—merely describes a cam assembly generally, irrespective of how "cam

22  assembly" is used in the claims or the specification, and ignoring what parts are included in the

23  recited "cam assembly." As noted above, general terms in claims must be understood in the context

24  presented by the inventor. *Markman*, 52 F.3d at 979; *Phillips*, 415 F.3d at 1315-1316; *In re Glaug*,

25  283 F.3d at 1340; *Kaneka*, 790 F.3d at 1305. SRAM's proposed construction is deficient in this

26  regard. Accordingly, FOX's proposed construction "cam assembly" better captures the meaning of

27  this claim term.

28

### E.  "operatively connected"

| Claim Term | FOX | SRAM |
|---|---|---|
| "operatively connected to said second end"/"operatively connected to said second end of said axle"/"operatively connected to the second end"/"operatively connected to a second end of said axle" | affixed to the second end portion of said axle so that opening and closing the lever moves the cam housing axially relative to the axle[5] | mechanically linked or put in contact with [the/a] second end [of said axle] in a working or effective manner |

The parties dispute the meaning of "operatively connected," a term that appears in several places in the patent claims. FOX construction requires that they be physically affixed or connected, while SRAM contends that "operatively connected" requires only that two components be "put in contact." Given the intrinsic evidence, particularly the numerous times the inventors distinguished Rose, FOX's proposed construction is correct.

The intrinsic evidence shows that both the cam assembly and the lever are affixed or connected to the second end of the axle. The claims recite "a cam assembly operatively connected to said second end . . . [and] a lever operatively connected to said second end of said axle . . . ." Ex. A at 16:31-36. The specification explains that the cam assembly is attached to the second end of the axle shaft by the cam follower shaft (which is located within and affixed to the axle shaft's second end, as explained in Section III.D, *supra*). *See also* Ex. A at 10:33-43. The specification also variously describes the lever in the embodiments as connected to the cam assembly and also as part of the cam assembly. *E.g.*, Ex. A at 8:41-42 ("a lever-operated cam assembly comprising a lever mounted on a second end of the axle"); 8:33 ("a cam assembly that has a lever"); 11:17-20 (describing the lever as connected to the cam shaft, which is part of the cam assembly). These are all descriptions of the same fundamental axle/cam assembly/lever structure shown in the drawings and described in the specification, and either way, the lever is affixed or connected to the second end of the axle.

---

[5] In the joint claim construction statement, FOX's construction ended with "moves the cam axially relative to the axle." In the interest of clarity, FOX has added the words "housing" to refer to cam housing 4 in its construction here. The gist of the construction remains the same.

Moreover, as described above, the Rose design was repeatedly criticized by the inventors. *See* Section II.B, *supra*. In Rose, the tubular axle shaft was not physically *connected* to the skewer, cam assembly, or lever, but instead all of those components were merely placed *in contact* with the axle shaft and held in place by inserting wedges into the ends of the axle shaft. (This is why SRAM's construction focuses on "contact" rather than "connection.")  When Rose's wedges were removed, the whole assembly came apart. There are numerous problems with the Rose design identified in the specification of the patents-in-suit and overcome by the FOX inventors. *See* Section II.B, *supra*; Ex. A at 2:24-58. The FOX inventors eschewed the Rose design by affixing/connecting the various components together, rather than holding them in place with wedges. For these reasons, "operatively connected" should not be construed in a manner that would encompass the Rose design that the inventors repeatedly criticized and distinguished. *See LizardTech*, 424 F.3d at 1343-44; *ResQNet.com*, 346 F.3d at 1380. Further, there is no explanation in the patents-in-suit of how the invention could be constructed with a lever or cam assembly not affixed/connected to the axle shaft.

In addition, the modifier "operatively" in "operatively connected" means only that the components must be connected in a way that enables them to perform an operation. The patents describe how the lever portion of the invention operates: as the lever moves between open and closed positions, cam housing 4 moves axially away from and towards the axle. *See* Ex. A at 10:57-59 ("Rotation of the cam shaft 12 via the lever 3 causes the cam housing 4 to move either axially inward or outward relative to the shaft 13 as described in greater detail below."); 11:12-16 (similar). The term "operatively connected" means that the components are affixed/connected in a way that allows this function to be performed, which is reflected in FOX's proposed construction ("affixed to the second end portion of said axle *so that opening and closing the lever moves the cam housing axially relative to the axle*"). "Operatively connected" does not suggest that "connected" means only "touching."

SRAM's proposed construction is inconsistent with the intrinsic evidence above. SRAM's inclusion of "mechanically linked" is also flawed as that term is vague and ambiguous and may itself require construction. It is unclear whether SRAM contends that components that are touching, but not otherwise connected, would fall within the scope of "mechanically linked." If so, this term is

inconsistent with the specification and repeated distinguishing of Rose, described above. Additionally, "mechanically linked" is overly general and not tied to the context provided in the specification. General terms in claims must be understood in the context presented by the inventor. *Markman*, 52 F.3d at 979; *Phillips*, 415 F.3d at 1315-1316; *In re Glaug*, 283 F.3d at 1340; *Kaneka*, 790 F.3d at 1305. For all of the above reasons, the Court should adopt FOX's construction for this term.

**F.  "substantial portion of said lever"**

| Claim Term | FOX | SRAM |
|---|---|---|
| "substantial portion of said lever" | portion of said lever sufficient to reduce the chance of snagging and accidental release of the lever by contact with landscape during use | a significant or material portion of the lever |

The parties disagree regarding the correct meaning of "substantial portion" and whether that term should be understood according to statements made in the specification. FOX proposes that explanations and context from the specification be included in the construction, whereas SRAM proposes that the word "significant" be substituted for the word "substantial." SRAM's construction will not be helpful to the jury and instead appears intended to further SRAM's indefiniteness challenge to this claim term. Because FOX's proposed construction is tied directly to what the inventors conveyed in the specification, and because the word "significant" does not offer any clarity regarding the scope of the claim, FOX's proposed construction should be adopted.

Because "substantial" is a general term and its meaning is not expressly defined in the claims, the Court should consult the specification to determine the proper construction. *See In re Glaug*, 283 F.3d at 1340; *Kaneka*, 790 F.3d at 1305. "Substantial" is a meaningful modifier sometimes used in patent claims implying "approximate" rather than "perfect," and avoiding a strict numerical boundary. The Federal Circuit has expressly approved of the use of "substantial" in claim language. *See Playtex Products, Inc. v. Proctor & Gamble Co.*, 400 F.3d 901, 907 (Fed. Cir. 2005) ("The plain language of claim 1, i.e., 'substantially flattened' [surface] requires neither a perfectly flat surface, nor one that is flat within a manufacturing tolerance."). Recognizing that "substantial" is capable of multiple interpretations, a court should consider the intrinsic evidence in determining the

proper construction. *See Deering Precision Instruments, L.L.C. v. Vector Distribution Sys., Inc.*, 347 F.3d 1314, 1323 (Fed. Cir. 2003) ("Since the term 'substantially' is capable of multiple interpretations, we turn to the intrinsic evidence to determine which interpretation should be adopted.").

The specification of the patents explains that a "substantial portion" of the lever is a portion sufficient to reduce the chance of snagging and accidental release of the lever by contact with landscape during use. More specifically, the specification and claims note that when the lever is in a closed position, a substantial portion of the lever is within a recess created by the fork leg profile, and a portion less than a whole of the lever protrudes outside of the recess (i.e., protrudes laterally from said vehicle). *See* Ex. A at Fig. 4C; 16:39-44 (claim language).



FIG. 4C

The specification explains that this configuration "helps to reduce snagging of the lever on branches for example and reduces the likelihood of accidental opening." Ex. A at 5:23-30. It further explains:

> In this way most of the lever 3 is kept inside the line of the fork to
> reduce the chance of snagging and accidental release during use.

Ex. A at 11:22-24. Accordingly, when read in light of the specification, a "substantial portion of the lever" means a portion of the lever sufficient to prevent snagging on passing terrain and inadvertent opening of the lever. *See Deering*, 347 F.3d at 1322-1323 (relying on the operation and benefits recited in the specification to construe "substantially" in "portion [of sliding weight] disposed

substantially in an imaginary plane"). FOX's construction directly incorporates this same language and should be adopted.

SRAM's proposed construction, essentially substituting the words "significant or material portion" for "substantial," ignores the meaning and context described in the specification should be rejected for this reason. *Markman*, 52 F.3d at 979; *Phillips*, 415 F.3d at 1315-1316; *In re Glaug*, 283 F.3d at 1340; *Kaneka*, 790 F.3d at 1305. Further, SRAM's construction will not be helpful to the jury because the words "significant or material portion" do nothing to clarify this disputed claim term or how one of skill in the art would understand it from the patent. Indeed, SRAM has asserted that this claim term is indefinite in its invalidity contentions, and its construction appears designed to preserve its challenge.

**G.   "substantially unimpeded by an adjacent part of said vehicle" (the '172 patent)**

| Claim Term | FOX | SRAM |
|---|---|---|
| "substantially unimpeded by an adjacent part of said vehicle" | without the user having to manipulate the lever during one-handed rotation to avoid interference or blockage by an adjacent part of said vehicle | not significantly or materially hindered or blocked by an adjacent part of the vehicle |

As with the term "substantial portion" above, the parties' dispute here turns on whether "substantially unimpeded" should be construed based on the specification or instead by substituting "significantly or materially." The term should be construed based on the description in the specification. *See Deering*, 347 F.3d at 1323.

The disputed claim limitation in the '172 patent is focused on the user's ability to rotate the lever with one hand when installing/removing the axle assembly, and with the rotation being "substantially unimpeded by an adjacent part of said vehicle" (*see* dependent claim 2). The specification explains that FOX's improved inventive design avoids certain problems with prior art quick release skewers:

> When using one hand to rotate the axle using the [prior art] quick release lever, the rotation of the lever can be blocked by another part of the bicycle such as the cylinder of a suspension fork. We have overcome this problem by limiting the range of motion of the

> lever between open and closed positions (i.e. locked and released), so that the lever can be rotated to thread the opposite end of the axle into the axle nut without interfering with a component of the bicycle. ***During rotation the user does not have to manipulate the lever so as to avoid an adjacent bicycle component***.

*Id.* at 4:5-15 (emphasis added); *see also id.* at 3:53-57 ("[T]he stiffness properties of an axle can be combined with the properties of a quick release to provide a quick release axle that is useful on cross-country mountain bikes for example, ***which requires only one hand to set and release***." (emphasis added)). The advantages described in the emphasized language above are incorporated into FOX's construction because they are how one of ordinary skill in the art would understand rotation of the lever that is "substantially unimpeded by an adjacent part of [a] vehicle." *Id.* at claim 2. They will also help and provide clarity for the jury.

More specifically, the specification explains that when the lever is opened, the range of motion between the opened and closed position (the "maximum angle of rotation") is limited to less than 180 degrees, and preferably to between 120 and 165 degrees, due to the inventive "lever stop." *E.g.*, Ex. A 4:29-34; 11:17-45. This restricted angle of rotation creates clearance between the open lever and the adjacent fork leg when the lever is rotated, so that the user can freely rotate the lever (to install or remove the axle assembly) with one hand, and without interference or blocking by the fork leg or other adjacent vehicle component:

> This angle ***enables the lever 3 to be rotated one-handed*** about the axis of the shaft 13 ***without coming into contact with the fork leg.*** For example, a user can hold the bicycle upright with one hand, and with the other rotate the lever 3 about the axis of the shaft 13.

*Id.* at 11:32-36 (emphasis added).

SRAM's construction—replacing "substantially unimpeded" with "not significantly or materially hindered or blocked" —offers no benefit over the existing claim language, ignores the explanations of this otherwise general term in the specification, and should be rejected. *Markman*, 52 F.3d at 979; *Phillips*, 415 F.3d at 1315-1316; *In re Glaug*, 283 F.3d at 1340; *Kaneka*, 790 F.3d at 1305. SRAM's its construction appears designed to further its indefiniteness challenge rather than help the jury or clarify how one of ordinary skill in the art would understand "substantially

unimpeded" after reviewing the patent.  For all of the above reasons, the Court should adopt FOX's construction for this term.

### H. "does not substantially interfere with said adjacent vehicle component when said axle is rotated" (the '009 patent)

| Claim Term | FOX | SRAM |
|---|---|---|
| "does not substantially interfere with said adjacent vehicle component when said axle is rotated" | does not require the user to manipulate the lever to avoid interference or blockage by an adjacent vehicle component during one-handed rotation of said axle | is not significantly or materially hindered or blocked by an adjacent vehicle component when the axle is rotated |

As with the prior term ("substantially unimpeded"), the parties' dispute here is whether "substantially interfere" should be construed based on the description in the specification or by substituting "significantly or materially" for "substantially." The term should be construed based on the description in the specification. *See Deering*, 347 F.3d at 1323.

Essentially the same analysis for the preceding term applies here. This disputed term appears in the final claim limitation of claim 1 in the '009 patent, which recites, in part, "said lever, in open position, does not substantially interfere with said adjacent vehicle component when said axle is rotated." Again, the specification shows that this claim limitation is focused on the user's ability to rotate the lever with one hand, without substantial interference, when installing or removing the axle assembly. *E.g.*, Ex. A at 4:5-15 ("During rotation the user does not have to manipulate the lever so as to avoid an adjacent bicycle component."); 3:53-57 (invention "requires only one hand to set and release."); 11:32-36 ("This angle enables the lever 3 to be rotated one-handed about the axis of shaft 13 without coming into contact with the fork leg.")  FOX's construction is true to the specification and should be adopted.

SRAM's construction does little more than replace "does not substantially interfere" with "not significantly or materially hindered or blocked," does nothing to clarify the claim language, appears designed to further SRAM's indefiniteness challenge, and fails to consider the context of the intrinsic evidence as required for this otherwise general term. *Markman*, 52 F.3d at 979; *Phillips*, 415 F.3d at 1315-1316; *In re Glaug*, 283 F.3d at 1340; *Kaneka*, 790 F.3d at 1305.

For all of the above reasons, the Court should adopt FOX's construction for this term.

1

## V.    CONCLUSION

2

The Court should adopt FOX's proposed constructions for each of the disputed terms of the

3

asserted patents.

4

Dated: June 1, 2017                                FINNEGAN, HENDERSON, FARABOW,

5                                                                GARRETT & DUNNER, LLP

6

7

8                                                       By:    /s/ Jeffrey D. Smyth
                                                              Jeffrey D. Smyth
9                                                              Attorney for Plaintiff
                                                              FOX Factory Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28